# In the United States District Court
## for the Southern District of Georgia
### Brunswick Division

JONATHAN SMITH; STREAMLINE LOGISTICS, LLC; BETTY PADGETT; B & L EXPRESS, INC.; JOHN L. DARNELL, JR.; HENRY EDWARDS; and LINDA J. FIFIELD, individually and on behalf of others similarly situated,

    Plaintiffs,

v.

GEORGIA ENERGY USA, LLC; GEORGIA PETRO USA, .LLC; FAIRLEY CISCO; CISCO OIL, INC; CISCO TRAVEL PLAZA, INC.; CISCO TRAVEL PLAZA, INC. II; UNITED FUEL, INC.; KULDEEP S. SEKHON; ALTHEA CISCO SHAVE; TAMMY CISCO WALKER; JACK GHAZI; KINGSLAND MANAGEMENT, LLC; KINGSLAND MANAGEMENT II, LLC; GEORGIA PETRO II USA, LLC; BIJU ABRAHAM; and GLOBAL ENERGY USA, LLC,

    Defendants.

CIVIL ACTION

NO. CV208-20

## O R D E R

Plaintiffs, Jonathan Smith; Streamline Logistics, LLC; Betty Padgett; B & L Express, Inc.; John L. Darnell, Jr.; Henry Edwards; and Linda J. Fifield, filed this putative class action against Defendants, Georgia Energy USA, LLC; Georgia Petro USA, LLC; Fairley Cisco; Cisco Oil, Inc.; Cisco

Travel Plaza, Inc.; Cisco Travel Plaza, Inc. II; United Fuel, Inc.; Kuldeep S. Sekhon; Althea Cisco Shave; Tammy Cisco Walker; Jack Ghazi; Kingsland Management, LLC; Kingsland Management II, LLC; Georgia Petro II USA, LLC; Biju Abraham; and Global Energy USA, LLC.

Plaintiffs assert claims under Georgia law for fraud, negligent misrepresentation, negligence, money had and received, unjust enrichment, and for violating Georgia's Uniform Deceptive Trade Practices Act. Presently before the Court is Plaintiffs' motion to certify the case as a class action. Certain Defendants, Fairley Cisco, his daughters, Shave and Walker, and their related companies (Cisco Oil, Cisco Travel Plaza, and Cisco Travel Plaza II), have filed a response in opposition. Because class treatment is appropriate under Federal Rule of Civil Procedure 23, Plaintiffs' motion will be **GRANTED**, but the Court will alter Plaintiffs' proposed class definitions and limit the scope of the class to claims arising after 2004.

## BACKGROUND

For several years, Fairley Cisco owned, or had a controlling interest in, three filling stations in Camden

2

County, Georgia. Cisco I is located off of Interstate 95 at exit 6, and sold gasoline and diesel fuel to motorists and commercial truck drivers. Cisco II is located off of I-95 at exit 1, and also sold gasoline and diesel fuel. Cisco Express is located across the street from Cisco I, and sold gasoline only. These stations have sold a large volume of fuel over the past decade, partly because their locations are close to Florida.[1] During several recent years, Florida's gasoline taxes have been higher than Georgia's gasoline tax rate. Dkt. No. 92, Ex. A.

On February 12, 2008, in response to an anonymous call, the Georgia Department of Agriculture made an unannounced inspection of the three Cisco stations to determine the accuracy of the fuel pumps. State officials determined that many of the pumps were miscalibrated, and dispensed less fuel than indicated to consumers. At least for a time, the state shut the stations down as a result. In connection with the state investigation, fuel pump technicians were called to the

_____

[1] Plaintiffs aver in their complaint that more than 1/3 of the class members are from a state other than Georgia, and there has been no suggestion to the contrary by Defendants. It appears the Court has diversity jurisdiction pursuant to the Class Action Fairness Act, codified at 28 U.S.C. 1332(d), and that the "local controversy" exception has no application to this case. Evans v. Walter Indus., Inc., 449 F.3d 1159, 1164 & n.2 (11th Cir. 2006).

AO 72A
(Rev. 8/82)

stations. One of those technicians, Daniel Wayne Blair, was an employee of a Florida company called Fueling Components. Blair retrieved historical data from the electronic gasoline pumps at all three locations. The data retrieved by Blair show all calibration changes since the pumps were installed in 2005, including the extent of recalibration, and date and times of recalibration.

The electronic gasoline pumps at the Cisco stations were Gilbarco-manufactured Eclipse model pumps. To prevent tampering, a seal is supposed to be placed on the pump by the last inspector or technician to examine the pump. The Eclipse pumps dispense fuel by counting the number of rotations of a device in the fuel line. This device causes a component part to turn while the fuel passes through the line. These rotations are called "pulses." For gasoline pumps, the typical test calibration volume is five gallons of fuel, which is equivalent to 1,050 pulses. To adjust the pulse count, the pump cabinet must be unlocked, and the wire seal securing the calibration components removed. When the historical data was retrieved from the Cisco electronic gasoline pumps, most of the wire seals were missing.

Lowering the number of pulses causes the pump to

4

dispense less fuel than is indicated on the pump dial. The pump historical data show that pumps at all three stations were miscalibrated routinely to dispense less gasoline than indicated by the dial on the pump. The shortage was approximately one quart per five gallons, or five percent.

Cisco I and Cisco II also sold diesel fuel. Cisco II had about fifteen diesel pumps and Cisco I had approximately eight diesel pumps. None of the truck diesel pumps had the ability to store historical calibration data. The calibration of these pumps was performed with a keypad or by turning a calibration dial, which were located inside the locked pump cabinet. At the time of inspection, around February 2008, none of the truck diesel pumps had any wire seals securing the calibration components. A proving can is a fuel can used to determine a fuel pump's accuracy, and a fifty gallon can is used for truck diesel pumps. A sight glass on the side of the vessel allows a person to measure whether the pump dispensed the correct amount of fuel. When the technician dispensed diesel fuel at Cisco II, after the stations were shut down by the state, the pump only dispensed forty-eight gallons into the proving can, although the pump indicated that fifty gallons had been pumped. This evidence

5

suggests that diesel customers were being shorted by four percent. The technician noted that the calibration dials on all the diesel pumps had been turned down to their lowest setting.

Plaintiffs are individuals and trucking companies who have purchased gasoline and diesel fuel at the three Cisco stations during the past several years. Cisco owned the stations until December 2006, when the stations were purchased by Sekhon. In early 2008, Sekhon sold the stations to Abraham. Sekhon and Abraham fled the jurisdiction before being served with the complaint.

Plaintiffs' proposed class definitions are as follows:

**Class A:** All persons or entities who purchased truck diesel fuel from the Cisco Travel Plaza on Exit 1 off of Interstate 95 in Camden County, from the Cisco Travel Plaza on Exit 6 off of Interstate 95 in Camden County and/or from the Cisco Express on Exit 6 off of Interstate 95 in Camden County during the ten (10) years preceding the filing of Plaintiffs' Complaint and who received less truck diesel fuel than indicated on the fuel pumps.

**Class B:** All persons or entities who purchased automotive gasoline from the Cisco Travel Plaza on Exit 1 off of Interstate 95 in Camden County, from the Cisco Travel Plaza on Exit 6 off of Interstate 95 in Camden County and/or from the Cisco Express on Exit 6 off of Interstate 95 in Camden County during the ten (10) years preceding the filing of Plaintiffs' Complaint and who received less automotive gasoline than indicated

6

on the fuel pumps.

## DISCUSSION

A class may not be certified unless it meets all the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure, and the party moving for class certification bears the burden of establishing these requirements. Heaven v. Trust Co. Bank, 118 F.3d 735, 737 (11th Cir. 1997). Rule 23(a) requires numerosity, commonality, typicality, and adequacy of representation. In addition, one of the requirements set forth in Rule 23(b) must be satisfied to maintain a class action. In a class action suit for money damages, common questions of law or fact must predominate over individual issues, and the class action device must be the superior method of adjudication. Fed. R. Civ. P. 23(b)(3).

The Court must conduct a "rigorous analysis" of the claims and evidence presented to determine whether class certification is appropriate. Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 161 (1982). The Court neither accepts the plaintiffs' allegations as true, nor requires the plaintiffs to show that they are likely to prevail on the merits. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177-78

7

(1974); <u>Love v. Turlington</u>, 733 F.2d 1562, 1564 (11th Cir. 1984).

"Class relief is 'peculiarly appropriate' when the 'issues involved are common to the class as a whole' and when they 'turn on questions of law applicable in the same manner to each member of the class.'" <u>Gen. Tel. Co. of the Sw.</u>, 457 U.S. at 155 (quoting <u>Califano v. Yamaski</u>, 442 U.S. 682, 701 (1979)). "[A]cheiv[ing] the economies of time, effort, and expense, and promot[ing] uniformity of decisions as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results" are critical considerations that guide the Court's determination. <u>Alabama v. Blue Bird Body Co.</u>, 573 F.2d 309, 315-16 (5th Cir. 1978)(quoting Fed. R. Civ. P. 23 advisory committee's note (1966)).[2]

> [A] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action. . . . On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there were material variations in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed.

[2] In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

AO 72A
(Rev. 8/82)

Fed. R. Civ. P. 23 advisory committee's note (1966).

## A. Requirements of Rule 23(a)

### 1. Numerosity

Guy Eberhardt, a certified public accountant retained by Plaintiffs, reviewed the evidence in this case and determined that there were over a half million transactions per year at Cisco II alone. Even assuming a small number of transactions involved rigged pumps, the number of class members involved are substantial. Plaintiffs anticipate over 10,000 class members nationwide, and propose to identify these customers through Defendants' records, media coverage, and advertising. The putative class is so numerous that joinder is impracticable, and the numerosity requirement is satisfied. Cox v. Am. Cast Iron Pipe Co., 784 F.2d 1546, 1553 (11th Cir. 1986).

### 2. Commonality

There must be at least one issue of law or fact that affects the entire class for the commonality requirement to be satisfied. The threshold for establishing commonality under Rule 23(a)(2) is not onerous -- where a common scheme

AO 72A
(Rev. 8/82)

of deception is alleged credibly, Rule 23(a)(2) is met.
E.g., <u>Powers v. Stuart-James Co.</u>, 707 F. Supp. 499, 502 (M.D.
Fla. 1989). Plaintiffs have identified a common scheme to
intentionally miscalibrate the gasoline and diesel fuel pumps
at these three Cisco filling stations. The Court concludes
that common issues of law and fact exist, and that Rule
23(a)(2) is satisfied. <u>Amchem Prods., Inc. v. Windsor</u>, 521
U.S. 591, 623-24 (1997).

## 3. Typicality

Rule 23(a)(3) is satisfied if the class representatives'
claims are like the claims of the absent class members. "A
sufficient nexus is established if the claims or defenses
arise from the same event or pattern or practice and are
based on the same legal theory." <u>Kornberg v. Carnival Cruise
Lines, Inc.</u>, 741 F.2d 1332, 1337 (11th Cir. 1984). Where the
defendant's actions impact the named representatives in
substantially the same way as other class members, typicality
is satisfied. <u>Collins v. Int'l Dairy Queen, Inc.</u>, 168 F.R.D.
668, 674 (M.D. Ga. 1996). The named Plaintiffs' claims are
like those of absent class members, and the typicality
requirement is met.

AO 72A
(Rev. 8/82)

## 4. Adequate Representation

Under Rule 23(a)(4), class representatives must "fairly and adequately protect the interests of the class." The class representatives' interests cannot be antagonistic to the interests of the other class members, and the class representatives' attorneys must be well-qualified. Kirkpatrick v. J. C. Bradford & Co., 827 F.2d 718, 726 (11th Cir. 1987). Rule 23(a)(4) embodies the values of due process of law. If absent class members are to be bound by an adjudication of their rights and interests, fundamental notions of fair play and justice require that they be represented adequately. Hansberry v. Lee, 311 U.S. 32, 41-43 (1940). The named Plaintiffs do not appear to have antagonistic interests to those asserted on behalf of absent class members. Additionally, class counsel have sufficient experience in litigating class actions. The requirements of Rule 23(a)(4) are satisfied.


## B. Requirements of Rule 23(b)(3)

## 1. Common Issues of Law or Fact Predominate

"Predominance is a test readily met in certain cases alleging consumer . . . fraud." Amchem Prods., Inc., 521

11

U.S. at 625. However, where disparities among class members are significant, caution must be exercised by the district court in determining whether to certify the class. Id. "The key concept in determining the propriety of class action treatment is the existence or nonexistence of material variations in the alleged misrepresentations." Grainger v. State Sec. Life Ins. Co., 547 F.2d 303, 307 (5th Cir. 1977).

Common issues must only predominate over the individual issues. Thus, the possible existence of individual defenses and the need for individual proof on subsidiary questions such as damages will not defeat class certification where common issues predominate. 7A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1778 (2d ed. 1986).

> "Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action." . . . Common issues of fact and law predominate if they "have a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief." . . . Where, after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, such claims are not suitable for class certification under Rule 23(b)(3).

Klay v. Humana, Inc., 382 F.3d 1241, 1255 (11th Cir. 2004)

12

(quoted sources omitted)(emphasis added).

On the other hand, the old Fifth Circuit described "a classic case for a Rule 23(b)(3) class action" as follows:

> The claims of a large number of individuals can be adjudicated at one time, with less expense than would be incurred in any other form of litigation.  The claims are relatively small, said even by the plaintiffs to average less than $100 each, and the question of law is one that applies alike to all.  While it may be necessary to make individual fact determinations with respect to charges, if that question is reached, these will depend on objective criteria that can be organized by a computer, perhaps with some clerical assistance.  It will not be necessary to hear evidence on each claim.
> A number of similar class actions have been certified by district courts, and appear to have been susceptible of management.  Certification will achieve one of the primary purposes of the class action, "enhancing the efficacy of private actions by permitting citizens to combine their limited resources to achieve a more powerful litigation posture."

Roper v. Consurve, Inc., 578 F.2d 1106, 1112-1113 (5th Cir. 1978)(quoting Hawaii v. Standard Oil Co. of Cal., 405 U.S. 251, 266 (1972))(footnote omitted).

Plaintiffs insist that common issues of law and fact predominate over the individual issues presented in this action because all class members' claims are based on the same pattern of wrongful conduct by Defendants.  Plaintiffs urge that the manner in which the class will show Defendants'

AO 72A
(Rev. 8/82)

liability will be based on the same evidence. According to
Plaintiffs, resolution of the common factual and legal issues
will establish the extent of Defendants' liability, if any,
to the class for the alleged wrongful conduct, and class
members' entitlement to monetary relief. To the contrary,
Defendants deny that common issues are overwhelming.

To determine whether individual issues predominate, the
Court must delve into the "'claims, defenses, relevant facts,
and applicable substantive law' . . . to assess the degree
to which resolution of the class-wide issues will further
each individual class member's claim against the defendant."
Klay, 382 F.3d at 1254 (internally quoted source omitted).

Plaintiffs assert that Defendants' pump-rigging was a
long-term scheme and that any individualized issues are
subordinate and should not prevent class certification. The
historical data presented by Plaintiffs show that the
gasoline fuel pumps at all three locations were miscalibrated
frequently for years before suit was filed. According to
Plaintiffs, a jury could conclude that this conduct was part
of a long-term plan to cheat the motoring public. Plaintiffs
posit that there is no reason to believe that such behavior
began only in 2005 when the electronic gasoline pumps were

14

first installed or even that Defendants' scheme was limited only to gasoline pumps. Plaintiffs have presented evidence that several of the diesel pumps were miscalibrated in March and May 2006, and February 2008. Dkt. No. 99, Ex. K. Plaintiffs contend that a reasonable jury could find that this widespread pattern of rigging the gasoline and diesel pumps persisted for many years and was only documented after 2005 due to the fact that Defendants were not aware that the newer electronic pumps were recording the frequent miscalibrations.

Defendants rejoin that their liability to any given class member turns on a number of fact-specific inquiries. Plaintiffs' evidence does not suggest that all fuel pumps were always uniformly miscalibrated. Instead, the calibration records suggest that no pump was always miscalibrated. Defendants assert that even when one meter was miscalibrated, other meters at the same station were not necessarily miscalibrated at the same time.

Defendants contend that the following six questions would need to be answered to determine liability for each transaction of each class member: (1) At which station did the potential plaintiff make the purchase? (2) On what date?

AO 72A
(Rev. 8/82)

(3) At what time? (4) Which dispenser did the potential plaintiff use? (5) Which fuel grade was purchased? and (6) Which meter corresponds to the dispenser and fuel grade used in the transaction? Defendants point out that these questions assume that the transaction occurred on a date and at a dispenser for which calibration records exist. Defendants also note that, if the transaction involved a diesel pump, a dispenser for which no records were available, or a dispenser that has now been replaced, then there are no calibration records for review, and no way to determine whether the transaction involved a miscalibrated meter.

Defendants disagree that the only individual questions are subsidiary matters such as damages. Instead, Defendants assert that "initial determinations, such as the issue of liability <u>vel non</u>, turn upon highly individualized facts." <u>Rutstein v. Avis Rent-A-Car Sys., Inc.</u>, 211 F.3d 1228, 1235-36 (11th Cir. 2000). Defendants agree that Plaintiffs' evidence shows the dates, store locations, and amount paid per transaction. But the records do not show the particular pump used, whether it was miscalibrated, or the extent of miscalibration. The records do not indicate the volume purchased, the price, or the grade of gasoline bought.

16

Defendants note that Plaintiffs are relying on the calibration records from the pumps to show calibration facts. Those records date back to, at the earliest, January 2005, and there are no records available for the diesel pumps and some of the unleaded pumps.

As Defendants conceded at oral argument, though, where records do exist, for each class member, if he or she paid at the pump, it is possible to check the records for the date purchased, and check the calibration for that pump for each meter. Damages can be calculated by finding the stated price that day and the volume purchased. Prior to installation of the electronic pumps, there is no record of when, or if, a given gasoline pump was miscalibrated. After installation, there is data showing the date and time that a given pump was miscalibrated. Although electronic pumps dispensing diesel fuel were never installed, a factfinder could make reasonable inferences based on the gasoline pump data and other relevant facts. Notably, the Georgia Department of Agriculture found that all the diesel pump dials were set to the lowest setting when the stations were shut down.

Contrary to Defendants' suggestion, the questions here relate to who is a proper class member, not questions of

17

liability. The Court is unconvinced by Defendants' argument that determining class membership will devolve into thousands of mini-trials on the merits. While determining class membership may involve some clerical data entry work and cross checking of records, it will not involve any courtroom proceedings or require the services of a jury. The Court concludes that determining class membership will not be so administratively difficult so as to preclude certification. Perez v. Metabolife Int'l, Inc., 218 F.R.D. 262, 269 (S.D. Fla. 2003)(certification improper where class members could not show objective proof of class membership).

Defendants' argument -- that determining class membership will go a long way toward resolving the claims -- only suggests that Defendants lack a defense on the merits of the allegations. Such a fact, if true, does not militate against certifying the class. Plaintiffs note that, as in all class actions, it is up to Plaintiffs and their counsel to figure out who is a member of the class. The class definition must provide the Court with practical standards to determine membership in the class. Pottinger v. Miami, 720 F. Supp. 955, 958 (S.D. Fla. 1989). The Court concludes that Plaintiffs' proposed class definitions meet that

18

standard.

Defendants cite Rutstein v. Avis Rent-A-Car Systems, Inc., in opposing Plaintiffs' motion. In Rutstein, the plaintiffs averred that Avis had "adopted as an official corporate policy a practice to discriminate against Jewish customers as a class of people and [had] instructed its employees to decline to open a corporate account for a business owned and/or operated by this class of people." 211 F.3d at 1231. Although the plaintiffs argued that the dominant issue was whether Avis had adopted such a policy, the court disagreed:

> Given that each plaintiff must demonstrate that he or she suffered from intentional discrimination, . . . "we expect that most, if not all, of the plaintiffs' claims will stand or fall, not on the answer to the question whether [Avis] has a practice or policy of [ethnic] discrimination, but on the resolution of . . . highly case-specific factual issues.

Id. at 1235 (quoting Jackson v. Motel 6 Multipurpose, Inc., 130 F.3d 999, 1006 (11th Cir. 1997)); see also Cooper v. Southern Co., 390 F.3d 695, 722 (11th Cir. 2004), disapproved on other grounds, Ash v. Tyson Foods, Inc., 546 U.S. 454, 457 (2006).

The cases relied on by Defendants, Cooper, Jackson, and Rutstein, were racial or religious discrimination cases, and

AO 72A
(Rev. 8/82)

are distinguishable. The kind of evidence and the methods of proof Plaintiffs would use to prove liability are materially different. The Eleventh Circuit's concern over individual mini-trials was understandable given the difficult, individualized fact issues that factored into any given case alleging purposeful discrimination on the basis of a protected status. The putative classes in those cases asserted discrimination because they had been denied service altogether, had been given inferior service, or had their accounts cancelled once opened. Whether any given class member faced invidious discrimination would have been unclear, even had the class prevailed and showed some general corporate discriminatory policy. Further, specific factual defenses to liability existed as to the putative class members, which would have required individual mini-trials. _Klay_, 382 F.3d at 1256-57.

This case is more like _Klay_ and _Roper_. Plaintiffs' evidence establishes liability, or not, on a common basis as to the class members' claims. The individual issues relate to determining who the appropriate class members are. Defendants' arguments and proposed questions are not the sort that would require trial time, or even a significant amount

20

AO 72A
(Rev. 8/82)

of attorney involvement. These objections are not the sort that prevent certification.[3]

In a civil lawsuit, the Court is permitted to draw an adverse inference against a litigant who invokes his rights against self-incrimination. Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc., 561 F.3d 1298, 1305 (11th Cir. 2009). "The decision to invoke the Fifth Amendment does not have to be consequence-free." Id. "The key to unlocking a court's inherent power is a finding of bad faith." Barnes v. Dalton, 158 F.3d 1212, 1214 (11th Cir. 1998). A litigant demonstrates bad faith when he disrupts litigation. Eagle Hosp. Physicians, LLC, 561 F.3d at 1306.

During Fairley Cisco's deposition, he was asked whether he "engaged in the destruction of documents" pertaining to these three businesses, and whether he "burned boxes of documents" at his house relating to the three filling stations. Cisco declined to answer these questions, instead invoking his Fifth Amendment rights. Cisco also refused to

---

[3] No problems of individualized reliance appear to be present in this action. Indeed, at oral argument, counsel for Defendants disclaimed resting their opposition to class certification on reliance grounds. Reliance should be a common issue, and would not preclude class treatment even if Defendants can show a lack of reliance as to any particular class member. Kirkpatrick v. J. C. Bradford & Co., 827 F.2d 718, 725 (11th Cir. 1987); Klay, 382 F.3d at 1259.

AO 72A
(Rev. 8/82)

reveal whether he had "hired someone to remove several truckloads of documents from a storage location for the purpose of destroying or concealing documents relat[ing] to the business." Dkt. No. 99, Ex. L, Cisco Dep. 10 & 11. Instead of denying that he had rigged the pumps when he owned the stores, Cisco invoked his rights against self-incrimination.

According to Britt Clinton Moore's deposition testimony, he worked for Cisco at the stations since 1996. At the time of his deposition, he worked for the successor company owned by Abraham. Moore testified that he had been a manager for Cisco for over eleven years, and that he was responsible for document storage and management. Moore testified that when Cisco fuel station documents were no longer needed, Moore's regular practice was to take the records to the dump. Dkt. No. 99, Ex. P, Moore Dep. 15. After the state shut down the stations, Moore removed and destroyed two truck loads of documents relevant to this lawsuit. Moore testified that company practice was to retain documents for at least three years. Moore stated that while cleaning out the documents, he saw many records that were more than three years old. Moore further testified that when he cleared out

AO 72A
(Rev. 8/82)

the documents after the stations were shut down, he burned the papers at Fairley Cisco's house. Moore "made sure he wasn't throwing away anything that was new." Id. at 21.

Moore testified that he burned the documents instead of taking them to the dump because he did not have enough time to go to the dump. Yet, Moore also reported that he underwent the massive document clearing project because the stations had been shut down, and he wanted to impress his new employer with his diligence and resourcefulness. Moore stated that the reason he quit burning documents was that, after he had taken a couple of loads, he noticed someone from the Georgia Bureau of Investigation watching him near where the records were stored. Id. at 30. Moore realized that someone might think he was trying to destroy evidence. Id. at 26. Later in his deposition, Moore added that someone had placed two locks on the storage facility, which made it clear to him that he should not destroy any more documents. Id. at 36.

Moore testified that it had probably been seven or eight years since anyone had cleaned out the storage facility at exit seven, where records were kept from the stores located off of exit six. Moore also testified that, as far as he

AO 72A
(Rev. 8/82)

knew, the container holding the records from the exit one store had never been cleaned out, and that "it was full" at the time he destroyed these records. Id. at 34.

There is evidence that Moore had a long history of a close business and personal relationship with Cisco. According to Moore, the evidence burned overwhelming related to Cisco, not later owners. And there is no, or very little, evidence relating to the period of time when Cisco owned the stations that was not destroyed. The burning was conducted at Cisco's house. Considering all these circumstances, there is sufficient evidence to conclude that Moore was acting as Cisco's agent, and that the destruction of the evidence was willful.

Under Georgia law,

> If a party has evidence in his power and within his reach by which he may repel a claim or charge against him but omits to produce it, or if he has more certain and satisfactory evidence in his power but relies on that which is of a weaker and inferior nature, a presumption arises that the charge or claim against him is well founded; but this presumption may be rebutted.

Ga. Code Ann. § 24-4-22; see also 29 Am. Jur. 2d Evidence § 256.

Plaintiffs maintain that any inability of the class members to verify their damages is primarily the result of

24

Defendants' destruction of crucial evidence. Defendants produced dozens of boxes in this case from the three stations during discovery. Documents contained therein reveal a variety of information related to the businesses, including credit card tapes, which recorded each time a customer swiped his or her card at the pump to pay for gasoline. Dkt. No. 99, Ex. M. Other records provide daily credit card reports and signed credit card receipts evidencing fuel purchases at the stations. Dkt. No. 99, Exs. N & O.

Plaintiffs submit that most of these documents show information such as the date of the fuel purchase, the time of the purchase, which pump was involved, the amount of fuel dispensed, the price per gallon, the total dollar amount of fuel sold, the name and/or account number of the cardholder, the brand of credit card, and the card's expiration date. Using such information, Plaintiffs suggest that those purchasers who bought fuel during the time that a specific pump was rigged could be pinpointed and the names and addresses of the purchasers can then be obtained from the credit card companies or clearinghouses. The amount of each credit card purchaser's damage could then be calculated, after determining the percentage of miscalibration on the

AO 72A
(Rev. 8/82)

date of the purchase (based upon the historical pump records) and the amount paid. Plaintiffs posit that such calculations are feasible. Dkt. No. 92, Ex. C, Blair Dep. 129-131.

Plaintiffs urge that the use of similar formulae have been applied repeatedly in class actions where a large number of individuals have been harmed in a similar manner. "Numerous courts have recognized that the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate." Allapattah Servs. v. Exxon Corp., 333 F.3d 1248, 1261 (11th Cir. 2003). "Particularly where damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods, the fact that damages must be calculated on an individual basis is no impediment to class certification." Klay, 382 F.3d at 1259-60; Roper v. Consurve, Inc., 578 F.2d 1106, 1112-1113 (5th Cir. 1978); Upshaw v. Ga. Catalog Sales, Inc., 206 F.R.D. 694, 701 (M.D. Ga. 2002).

Plaintiffs concede that this type of damages calculation would only be possible for credit card customers who bought fuel during the time period for which Defendants have provided credit card tapes, reports, and receipts. As

26

Plaintiffs suggest, those customers who paid for their fuel purchases with cash will have to present a receipt of their purchase to verify the transaction. The receipt would have the station name, the date and time of the purchase, the pump number, the amount of gallons purchased, and the price per gallon.

Plaintiffs assert that Defendants have provided virtually no such information pre-dating December 2006 due to the fact that the earlier documents were destroyed after the three fueling stations were shut down by the state. Plaintiffs submit that Defendants should not be rewarded for destroying the evidence that would provide the answers to the allegedly individualized questions which Defendants claim preclude class certification in this case.

A court may sanction a party for spoliation of evidence by instructing the jury that there is a rebuttable adverse inference that the missing evidence is harmful to the spoliator. Flury v. Daimler Chrysler Corp., 427 F.3d 939, 945 (11th Cir. 2005). "To determine whether spoliation has occurred, a court must address five factors: (1) prejudice to the non-spoiling party as a result of the destruction of evidence, (2) whether the prejudice can be cured, (3)

27

practical importance of the evidence, (4) whether the spoiling party acted in good or bad faith, and (5) the potential for abuse of expert testimony about evidence not excluded." Connor v. Sun Trust Bank, 546 F. Supp. 2d 1360, 1375-1376 (N.D. Ga. 2008). Plaintiffs insist that key evidence has been destroyed by Defendants in bad faith.

First, the documents that have been destroyed consisted of credit card information that would have enabled Plaintiffs to locate other members of the class and determine their damages. Second, the harm caused to Plaintiffs by the destruction of this evidence is highly prejudicial. As Moore testified, no other copies of the burned documents exist. Third, because this evidence would have allowed Plaintiffs to identify class members and their damages, it was important to this case. Fourth, the manner of the destruction of this evidence indicates that it was done in bad faith. The fact these documents were burned after the stations were closed down, that the only destroyed documents pertained to when Fairley Cisco owned the stations, and that the papers were burned in Cisco's backyard (as opposed to being taken to the dump) all demonstrate that this activity was done purposely to destroy crucial evidence in an attempt to avoid liability.

28

AO 72A
(Rev. 8/82)

Fifth, Plaintiffs maintain that the absence of these destroyed documents has hampered their ability to obtain meaningful expert testimony related to damages in this case.

Nonetheless, there is no telling which gasoline pumps were miscalibrated before the electronic pumps were installed in 2005. Moore did not destroy any documents showing miscalibration before 2005, because such documents did not exist. Accordingly, a spoliation inference is appropriate only from the time the electronic pumps were installed in 2005 through December 2006, when Cisco sold the stations. Any class member with evidence that they bought gasoline during that time period (i.e., those with credit card statements or cash receipts) are entitled to a presumption that they were shortchanged five percent. With respect to gasoline customers who bought fuel between December 2006 and the time this case was filed in 2008, class counsel will be responsible for matching up the batch records with the credit card tapes to determine the class membership. No presumption will apply as to these class members.

With respect to diesel customers, where there is evidence of miscalibration on the gasoline pumps, or a presumption as to the gasoline pumps in place, then diesel

AO 72A
(Rev. 8/82)

buyers during that time period may be entitled to a presumption that all diesel pumps were miscalibrated by four percent. While a reasonable jury could find such a fact based on the circumstantial evidence presented here, to be entitled to this inference, the diesel class members will have to produce evidence that they bought diesel fuel during the relevant time period (that is, they must produce credit card statements or cash receipts) where such proof is missing from Defendants' records due to destruction by Moore.

Where a defendant has engaged in a uniform scheme of fraudulent conduct toward the public or a large group of people, class treatment is appropriate. The Court finds that common issues of law or fact predominate.

## 2. The Class Device is the Superior Method of Adjudication

Rule 23(b)(3) provides a nonexclusive list of factors for the Court to consider to determine whether the class action is the superior means of dispute resolution:

> The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of

AO 72A
(Rev. 8/82)

the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3).

These factors indicate that a class action is the superior method of adjudication. First, no absent class member has indicated an interest in controlling the prosecution of a separate action. Second, there is no indication that there are other, related suits pending against Defendants by absent class members. Third, it is preferable to concentrate the litigation of this dispute in the Southern District of Georgia, where the averred fraud occurred, as this will promote efficiency and avoid inconsistent adjudications.[4] Fourth, the case appears to present no unusual case management problems. "[Manageability] will rarely, if ever, be in itself sufficient to prevent certification of a class. 'Courts are generally reluctant to deny class certification based on speculative problems with case management.' . . . Even

---

[4] "In a multi-state class action, variations in state law may swamp any common issues and defeat predominance." Castano v. Am. Tobacco Co., 84 F.3d 734, 741 (5th Cir. 2006). Here, Georgia law applies to all class members' claims. This is not a case where the court would have to determine and apply the consumer fraud laws of several states. Lyon v. Caterpillar, Inc., 194 F.R.D. 206, 223 (E.D. Pa. 2000). Indeed, Defendants do not contest that the class members' claims are governed by Georgia law.

potentially severe management issues have been held insufficient to defeat class certification." Klay, 382 F.3d at 1272-73 (quoted source omitted).

The Court rejects Defendants' suggestion that individual lawsuits are a superior means of adjudication. A "negative value" suit is one in which putative class members would expend more money by litigating their suits individually than they would stand to gain in damages on an individual basis. The "most compelling rationale for finding superiority in a class action [is] the existence of a negative value suit." Castano, 84 F.3d at 748.

Contrary to Defendants' argument, this is a negative value suit. Each class member's loss would likely not exceed $100, and punitive damages would be capped at about ten times that figure under Supreme Court precedent. State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 429 (2003). Even considering the availability of attorneys' fees, such a claim would not be worth pursuing on an individual basis. It would be inefficient and burdensome for the courts, the class, and Defendants, to allow the claims to be prosecuted individually. The Court concludes that the class device provides the best method to adjudicate the claims presented

AO 72A
(Rev. 8/82)

by Plaintiffs on behalf of the class.

## CONCLUSION

For the reasons explained above, Plaintiff's motion for class certification is **GRANTED**. Dkt. No. 92.

The Court will certify three subclasses, as follows:

**Class A:** All persons or entities who purchased automotive gasoline from the Cisco Travel Plaza on Exit 1 off of Interstate 95 in Camden County, from the Cisco Travel Plaza on Exit 6 off of Interstate 95 in Camden County, or from the Cisco Express on Exit 6 off of Interstate 95 in Camden County during the period from December 2006 until Plaintiffs filed their complaint, and who received less automotive gasoline than indicated on the fuel pumps.

**Class B:** All persons or entities who purchased automotive gasoline from the Cisco Travel Plaza on Exit 1 off of Interstate 95 in Camden County, from the Cisco Travel Plaza on Exit 6 off of Interstate 95 in Camden County, or from the Cisco Express on Exit 6 off of Interstate 95 in Camden County during the period after electronic pumps were installed in 2005 until December 2006, and who received less automotive gasoline than indicated on the fuel pumps.

**Class C:** All persons or entities who purchased truck diesel fuel from the Cisco Travel Plaza on Exit 1 off of Interstate 95 in Camden County or from the Cisco Travel Plaza on Exit 6 off of Interstate 95 in Camden County during the period after electronic gasoline pumps were installed in 2005 until Plaintiffs filed their complaint, and who received less truck diesel fuel than indicated on the fuel pumps.

AO 72A
(Rev. 8/82)

Excluded from these subclasses are those persons who hold or have held executive or legal positions with Defendants, the spouses or children of any such person, the spouses or children of Plaintiffs' counsel, the undersigned District Judge, Magistrate Judge James E. Graham, and any other judge, magistrate, or special master to whom this case may be assigned or referred, in whole or in part, as well as their spouses and children.

Certification of this class is provisional, and the Court may create additional subclasses, or decertify the class, at any time before final judgment, if subsequent developments so require. Fed. R. Civ. P. 23(c)(1)(C); Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 160 (1982).

Under Rule 23(c), individual notice must be given to all members of the class who can be identified reasonably. To the extent Defendants have not already done so, they are **DIRECTED** to make available to Plaintiffs all evidence in their possession that may help Plaintiffs in locating members of the class. Plaintiffs are **DIRECTED** to submit a proposed notice to class members, in accordance with Rule 23(c)(2)(B), for the Court's consideration, within thirty days of the entry of this order. Plaintiffs shall also identify and

34

AO 72A
(Rev. 8/82)

describe other measures they propose to take to locate and notify other potential class members. Within ten days of Plaintiff's submission, Defendants shall submit to the Court any objection they have to Plaintiffs' proposed notice, and may submit an alternative proposed notice.

**SO ORDERED**, this __10th__ day of August, 2009.

JUDGE, UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)