IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | | |
|---|---|---|
| JONATHAN SMITH, et al., | * | |
| Plaintiffs, | * | |
| v. | * | CV 208-020 |
| GEORGIA ENERGY USA, LLC, et al., | * | |
| Defendants. | * | |

# ORDER

This matter is now before the Court on Defendants Tammy Cisco Walker and Aletha Cisco Shave's Motion for Summary Judgment. (Doc. 190.) In this class action, Plaintiffs assert claims for fraud/negligent misrepresentation, negligence, money had and received, unjust enrichment, and violation of Georgia's Uniform Deceptive Trade Practices Act arising from the alleged fraudulent calibration of gasoline and diesel pumps at three filling stations in Camden County, Georgia. Fairley Cisco formed and owned, or had a controlling interest in, the three filling stations until 2000 when he transferred ownership to his daughters, Ms. Walker and Ms. Shave. Despite this transfer, Ms. Walker and Ms. Shave assert that they did not personally manage the stations at any point or involve themselves in any capacity in corporate decision making — functions they left to their

father's unfettered discretion. Accordingly, Ms. Walker and Ms. Shave contend there is no basis to impose personal liability against them, either on the grounds of (1) personal participation in the fraudulent scheme or (2) piercing the corporate veil. The Court agrees. For the reasons set forth below, the Court **GRANTS** Defendants Tammy Cisco Walker and Aletha Cisco Shave's Motion for Summary Judgment. (Doc. 190.)

## I. BACKGROUND

As the history of this litigation is long, the Court previously outlined the facts in thorough form in its August 10, 2009 Order granting class certification. (Doc. 127.) Of particular relevance to the instant motion, however, is the following:

The three filling stations at issue in this case were owned and operated by Cisco Travel Plaza, Inc., Cisco Travel Plaza II, Inc., and Cisco Express, Inc. (hereinafter, the "Cisco entities" or the "businesses") until 2006. (Shave Dep., Doc. 209-3, at 11, 16-17.) At formation, Mr. Cisco was the owner, but around the year 2000, he conveyed his entire interest to his daughters. (Id. at 9-10.) Despite this transfer, Mr. Cisco retained the roles of CEO and CFO, and he continued to manage nearly all aspects of the businesses. (Id. at 10; Cisco Dep., Doc. 209-1, at 6; Walker Dep., Doc. 209-2, at 6.) Indeed, Ms. Walker devoted "zero" hours per week to the businesses, "never worked

2

at any of the Plazas[,] or had any kind of relations to the Plazas." (Walker Dep. at 12, 19, 20.) Ms. Shave similarly testified that she had "no involvement" with the businesses. (Shave Dep. at 21, 27.) Instead, Mr. Cisco oversaw the entities' finances and accounting, and Ms. Walker and Ms. Shave "left everything up to their father." (Defs.' Statement of Material Facts ("DSMF"), Doc. 190-2, ¶¶ 6, 9; Pls.' Statement of Material Facts ("PSMF"), Doc. 245-1, ¶¶ 6, 9.) Only on occasion would Ms. Walker and Ms. Shave meet with their father to discuss the businesses, and this usually occurred informally at family gatherings. (DSMF ¶ 11; PSMF ¶ 11.) Mr. Cisco would ask for their advice sometimes, but Ms. Walker and Ms. Shave "left most of the decisions up to him." (Walker Dep. at 10.) When together, the family tended to talk about the entities as if they were one ongoing business. (Id. at 9.)

In 2006, Mr. Cisco negotiated the sale of the filling stations on behalf of the entities to Kuldeep Sekhon. (DSMF ¶¶ 12, 13; PSMF ¶¶ 12, 13.) Ms. Walker and Ms. Shave had no role in deciding the value of the businesses or the price for which they were sold. (Walker Dep. at 12-13.) Ms. Walker and Ms. Shave used approximately $8 million of the proceeds to pay off various bank debts owed by the Cisco entities, as well as the mortgage on a personal residence. (Shave Dep. at 13.) An additional $8 million in profit from the sale was deposited into

3

an account at Jax Federal Credit Union in the name of Cisco Travel Plaza II. (Walker Dep. at 6-7.) Ms. Walker and Ms. Shave periodically distributed funds to Mr. Cisco from that account for living expenses up until his death. (Shave Dep. at 15.) After the sale in 2006, there was no ongoing business for any of the entities. (Id. at 15-16; Walker Dep. at 7.)

## II. STANDARD OF REVIEW ON SUMMARY JUDGMENT

The Court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259-60 (11th Cir. 2004); FED. R. CIV. P. 56(c). The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal citation omitted). "[The] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record before the court] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If — and

only if — the movant carries its initial burden, the non-movant may avoid summary judgment by demonstrating that there is indeed a genuine issue as to the material facts of its case. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of those material facts "is 'genuine' . . . [only] if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

When ruling on the motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. Matsushita, 475 U.S. at 587. The Court must also avoid weighing conflicting evidence. Anderson, 477 U.S. at 255; McKenzie v. Davenport-Harris Funeral Home, 834 F.2d 930, 934 (11th Cir. 1987). Nevertheless, the non-moving party's response to the motion for summary judgment must consist of more than conclusory allegations, and a mere "scintilla" of evidence will not suffice. Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990); Pepper v. Coates, 887 F.2d 1493, 1498 (11th Cir. 1989).

## III. DISCUSSION

There are two distinct legal theories on which Ms. Walker and Ms. Shave, as owners of the Cisco entities, could be personally exposed to liability for the "ill-gotten gains realized from the scheme" (Doc. 28 at 2): (1) they took part in the commission of the fraudulent calibration scheme, or (2) they abused the corporate form to such a degree that the Court should disregard the established principle that a corporation is a separate entity distinct and apart from its shareholders. The Court addresses each in turn.

### A. Personal Participation

"[A] corporate officer, director, or shareholder who takes part in the commission of a tort by the corporation is personally liable therefor." Meredith v. Thompson, 719 S.E.2d 592, 594 (Ga. Ct. App. 2011) (citations omitted). Such liability arises not only in the instance of active "participation," but also where an officer, director, or shareholder "specifically direct[s] the particular act to be done" or "cooperate[s] therein." Id. Ms. Walker and Ms. Shave argue there is no genuine dispute as to any material fact in support of Plaintiffs' allegations that they (1) played a role in the fraud that occurred at the filling stations and (2) had any knowledge of the fraudulent calibration scheme until the

allegations appeared on the news. (DSMF ¶ 14; Shave Dep. at 21; Walker Dep. at 10.) Plaintiffs respond with a laundry list of facts that largely emphasize Ms. Walker's and Ms. Shave's status as owners of the Cisco entities and their alleged failure to observe corporate formalities. (PSMF ¶ 14.)

Plaintiffs' argument misses the mark under this theory of recovery. In this action, Plaintiffs allege that Defendants collectively misrepresented to the class the cost per gallon of gasoline and negligently maintained the fuel pumps at the filling stations in furtherance of the fraud. (Compl., Doc. 1, at 6-7.) The only relevant evidence before the Court to prove such allegations as to Ms. Walker and Ms. Shave is the depositions of Ms. Walker, Ms. Shave, Mr. Cisco, and Michael Robert Clark.[1] Contrary to Plaintiffs' assertion, Mr. Clark's deposition does not finger all named Defendants in the pump-rigging scheme, but quite clearly Mr. Cisco and other low level filling station employees. (See Doc. 206-1 at 8, 10, 12-16.) Mr. Cisco's deposition likewise is of little value to prove any participation by his daughters as he invoked the Fifth Amendment in response to every question. (See Doc. 209-1.) Although the Court may draw an adverse inference from Mr. Cisco's silence

---

[1] Mr. Clark, an employee of the Cisco entities, provided the anonymous tip to the Department of Agriculture that sparked both this litigation and the State of Georgia's RICO action in state court. (Clark Dep. at 6, 13.) Mr. Clark admitted to fraudulently calibrating the pumps to deliver less fuel at the direction of Mr. Cisco. (Id. at 10.)

7

*against Mr. Cisco*, Eagle Hosp. Physicians, LCC v. SRG Consulting, Inc., 561 F.3d 1298, 1305 (11th Cir. 2009), such an inference does not work automatically to implicate Ms. Walker and Ms. Shave, both of whom testified fully, independently, and under oath.[2]

Indeed, Ms. Walker's and Ms. Shave's testimony reflects that neither had any involvement on the premises of the filling stations. (Walker Dep. at 12, 19, 20; Shave Dep. at 21, 27.) They further testified that they had no involvement in the operational or financial decision making, which they delegated to their father as general manager, CEO, and CFO. (Id.) The record, therefore, contains no evidence that Ms. Walker or Ms. Shave personally directed the particular fraudulent acts about which Plaintiffs complain; nor is there evidence that they personally participated or cooperated therein. Beasley v. A Better Gas Co., 604 S.E.2d 202, 206 (Ga. Ct. App. 2004) (finding corporate officer's alleged failure to provide proper training is not "sufficiently direct participation in a tort . . . to expose [an officer] to personal liability under Georgia law" and citing Towt v. Pope, 336 P.2d 276, 282 (Cal. Dist. Ct. App.

---

[2] At no point during the deposition did Plaintiffs ask Mr. Cisco specifically about his daughters' involvement. (See generally Cisco Dep.) The only questions tangentially relevant to Ms. Walker and Ms. Shave addressed whether "anybody connected with [the] three businesses . . . would have been involved in the generation or maintenance of any documents" and whether Mr. Cisco "ever asked anybody" or was "aware of anybody" who destroyed corporate documents. (Id. at 9.)

8

1959), for the proposition that "in the absence of active participation in an act of misfeasance, generally an officer of a corporation is not personally liable to a third person for nonfeasance"); Ceasar v. Shelton Land Co., 596 S.E.2d 755, 756 (Ga. Ct. App. 2004); cf. Jennings v. Smith, 487 S.E.2d 362, 364-65 (Ga. Ct. App. 1997) (finding corporate officer individually liable because he personally supervised the site of allegedly negligent construction).

### B. Piercing the Corporate Veil

"A cardinal precept of corporate law is that corporations are separate legal entities from their shareholders, officers, directors, and employees." Dep't of Transp. v. McMeans, 754 S.E.2d 61, 63 (Ga. 2014) (citations omitted). This is so even in the situation in which a corporation is owned solely by one person or only a few individuals. Shelby Ins. Co. v. Ford, 454 S.E.2d 464, 465 (Ga. 1995); Pazur v. Belcher, 659 S.E.2d 804, 809 (Ga. Ct. App. 2008). And this precept is not altered by the fact that owners may use and control the corporation to promote their own ends. Pazur, 659 S.E.2d at 809; Amason v. Whitehead, 367 S.E.2d 107, 108 (Ga. Ct. App. 1988) (citation omitted). Rather, legal separateness is warranted because a corporation insulates officers and individual shareholders from personal liability for the acts of the corporation, unless there is a legal reason to

pierce the corporate veil. Boswell v. Primary Care Prof'ls, 594 S.E.2d 725, 728 (Ga. Ct. App. 2004) (citing Commonwealth Fin. Corp. v. Sherrill, 398 S.E.2d 438, 438-39 (Ga. Ct. App. 1990)).

"There are a variety of circumstances in which the courts will . . . pierce the corporate veil and impose liability upon a shareholder for the acts of the corporation, typically on the theory that the corporation and the shareholder are mere alter egos of each other." 6 GARY A. HUGHES, GA. JUR. CORPS. § 1:23 (2011). "Although the term 'alter ego' is a metaphor that sometimes blurs analysis, Georgia courts have made it clear that to establish the alter ego doctrine, it must be shown that: [1] the stockholders' disregard of the corporate entity made it a mere instrumentality for the transaction of their own affairs[;] [2] there is such a unity of interest and ownership that the separate personalities of the corporation and the stockholders no longer exist[; and 3] to adhere to the doctrine of a separate corporate entity would promote injustice or protect fraud." Id.; Baillie Lumber Co. v. Thompson, 612 S.E.2d 296, 299 (Ga. 2005). Simply, "[t]here must be evidence of abuse of the corporate form," which may be shown by a "commingling on an interchangeable or joint basis or confusing the otherwise separate properties, records or control." Pazur, 659 S.E.2d at 808.

10

Given the fact-intensive nature of the veil-piercing analysis, the determination is typically one to be resolved at trial, where the trier of fact can make choices as to the credibility and weight of the evidence. J-Mart Jewelry Outlets, Inc. v. Standard Design, 462 S.E.2d 406, 407-08 (Ga. Ct. App. 1995) (citing Williams Plaza, Inc. v. Sedgefield Sportswear Div. of Blue Bell, Inc., 297 S.E.2d 342, 343 (Ga. Ct. App. 1982)). In light of Federal Rule of Civil Procedure 56, however, a court may grant summary judgment if a jury would have but one result. Id.

Plaintiffs contend that Ms. Walker and Ms. Shave "conducted their corporate and personal business on an interchangeable or joint basis." (Pls.' Resp., Doc. 205, at 2.) Relying heavily on Ms. Walker's and Ms. Shave's depositions to support their claims, Plaintiffs direct the Court's attention to testimony that Ms. Walker and Ms. Shave lacked knowledge about the Cisco entities' corporate and financial operations, specifically that they (1) never examined the bookkeeping and accounting records (DSMF ¶ 7, PSMF ¶ 7); (2) personally did not keep minutes (Shave Dep. at 18; Walker Dep. at 9); (3) held only informal meetings to discuss the businesses with their father (DSMF ¶ 11, PSMF ¶ 11); and (4) the "family treated all of the businesses as one" (Pls.' Resp. at 14; Walker Dep. at 9). Plaintiffs further emphasize that Ms. Walker and Ms. Shave made payments to their

11

father and settled a mortgage debt with profits from the 2006 sale of the filling stations (Shave Dep. at 13, 15) and that at least one of the Cisco entities' bank accounts remained open after 2006, even though there was no ongoing business (Walker Dep. at 7).

Considering the maxim that "[g]reat caution should be exercised by the court in disregarding the corporate entity" to expose a shareholder's personal assets to liability, the Court finds Plaintiffs' evidence wanting. McMeans, 754 S.E.2d at 63. There is simply no evidence that Ms. Walker and Ms. Shave used the Cisco entities as "mere instrumentalit[ies] for the transaction of their own affairs" such that "separate personalities" ceased to exist. Baillie Lumber Co., 612 S.E.2d at 299; cf. J-Mart, 462 S.E.2d at 408 (holding suppliers to a corporation were entitled to pierce the corporate veil and recover from the corporation's major shareholder where the corporation bought a new Cadillac for the shareholder with knowledge that it would soon cease to do business and paid a balance of several thousand dollars on the shareholder's personal credit card); Abbott Foods of Ga., Inc. v. Elberton Poultry Co., 327 S.E.2d 751, 752 (1985) (finding the trial court did not err in piercing the corporate veil where corporation's president and principal shareholder paid himself several thousand dollars in "salary advances" from the corporate

12

checking account despite it being substantially overdrawn and used company funds to make loan and insurance payments on his personal automobile, as well as to purchase another company's stock in his own name). Plaintiffs' lumped allegations of collective administrative failures by "Defendants" and apparent concession that *Mr. Cisco* "deliberately rigged the pumps . . . and burned documents" do not substantiate the propriety of piercing the corporate veil *as to Ms. Walker and Ms. Shave*. (Pls.' Resp. at 14.)

Ms. Walker's and Ms. Shave's depositions establish that Mr. Cisco — as manager, CEO, and CFO of the Cisco entities — handled all the corporate and financial matters, and the daughters were unaware of the details because they wholly trusted their father's business judgment. (Shave Dep. at 10, 14, 27; Walker Dep. at 10, 13.) The Cisco entities never employed Ms. Walker — she is a teacher — and Ms. Shave's sole role was "Secretary." (Shave Dep. at 10-11; Walker Dep. at 5, 20.) As Ms. Walker and Ms. Shave had no involvement in the day-to-day operation of the controlling entities or the filling stations themselves (Walker Dep. at 12, 19, 20; Shave Dep. at 21, 27; Doc. 210-1 at 42), there is no evidence that Ms. Walker and Ms. Shave used assets belonging to the Cisco entities, obtained personal loans from the Cisco entities, or commingled their independent assets with those of the Cisco entities. There is no evidence that it was

13

Ms. Walker's or Ms. Shave's idea to sell the Cisco entities, as opposed to a choice made by their father. (Walker Dep. at 12-13.) There is no evidence that the entities' cessation of business via sale was to further an illicit purpose harbored by Ms. Walker and Ms. Shave to avoid future liability related to the fraudulent calibration scheme, a scheme about which they knew nothing until it made the local news.

Finally, Ms. Walker's and Ms. Shave's distribution of profits from the sale of businesses are of no import. As Ms. Walker and Ms. Shave correctly note, "distribution of corporate profits is not the same as commingling personal and corporate assets." (Defs.' Reply, Doc. 214, at 8). To the extent the Court can discern, only once during the course of their six-year ownership did Ms. Walker or Ms. Shave receive any distribution of any kind from the Cisco entities, and they never received a salary. (Doc. 210-1 at 42, 43, 46.) There is no evidence in the record whatsoever that the money Ms. Shave did receive in approximately August 2006 — which she ultimately invested in another family business, Cisco Vegas Paradise — was inappropriate, without authority, or taken with a present intent to stiff the Cisco entities' creditors. See Milk v. Total Pay & HR Solutions, Inc., 634 S.E.2d 208, 212-13 (Ga. Ct. App. 2006). The *post*-sale distributions about which Plaintiffs complain are likewise wholly irrelevant to the issue of undercapitalization,

14

another ground on which the corporate veil may be pierced. Id.; Boswell, 594 S.E.2d at 728. Ms. Walker and Ms. Shave did not make distributions to their father or to themselves after the sale with the specific intent to undercapitalize the Cisco entities' current or future operations, as the entities at that point were in Kuldeep Sekhon's hands.

Plaintiffs, therefore, must hang their hat on Ms. Walker's and Ms. Shave's alleged failure to observe the corporate formalities: keeping and signing corporate minutes, reviewing financial records, and holding formal, noticed meetings with a proper quorum or majority. To the extent Plaintiffs contend that no corporate documents were *ever* made or kept by anyone at the Cisco entities, the record does not support them. And the fact that whatever documents did exist were seized by the State, molded in a trailer under the GBI's control (Shave Dep. at 4-5), or spoliated by Mr. Cisco (see Doc. 209-1) is of no relevance to whether piercing the corporate veil is appropriate *as to Ms. Walker and Ms. Shave*.

Moreover, the Court is not aware of any authority in Georgia – and Plaintiffs provide none – that suggests sloppy practices alone warrant loss of the corporate form's protections. Cf. Christopher v. Sinyard, 723 S.E.2d 78, 81 (Ga. Ct. App. 2012) (finding the trial court did not err in disregarding the corporate form where a homebuilding

15

corporation's only two officers failed to file its annual registration for a number of years; never signed the corporation's bylaws, issued stock certificates, or kept minutes of corporate meetings; made undocumented loans to the corporation; paid some of the corporation's creditors from their personal funds; and executed a false affidavit at a closing); Bishop Eddie Long Ministries, Inc. v. Dillard, 613 S.E.2d 673, 684 (Ga. Ct. App. 2005) (finding veil-piercing appropriate where a corporation never opened or maintained a bank account, issued stock, held directors' or shareholders' meetings, filed tax returns, or kept corporate minutes; failed to file its annual report with the Secretary of State for nine years; and fraudulently represented to the plaintiff and the Department of Natural Resources over a period of years that it did not own the property at issue in the underlying easement dispute). And lastly, there is no evidence that any of Ms. Walker's and Ms. Shave's purported administrative failures — as opposed to Mr. Cisco's conduct — resulted in any detriment to Plaintiffs. See Commonwealth Fin. Corp., 398 S.E.2d at 439 (affirming lower court's denial of the right to pierce the corporate veil against a stockholder in spite of evidence showing his failure to "comply with the legal requirements of operating in a corporate capacity" because "there was no evidence showing that he

disregarded the separation of the corporate entity by commingling assets or abusing the corporate form").

Simply, Ms. Walker and Ms. Shave's "negligible corporate involvement precludes the operation of [the Cisco entities] as [their] 'alter ego'." Boswell, 594 S.E.2d at 728-29 (finding a corporate president was not individually liable for the corporation's default on a contract in view of testimony that he was not party to the contract, had nothing to do with the corporate or financial operations because an administrator handled such matters, and there was no evidence that the corporation's cessation of business was for the purpose of avoiding debt rather than a necessity engendered by lack of profits). As there is no genuine issue of material fact as to whether Ms. Walker and Ms. Shave disregarded the separateness of the corporate entities they owned, Plaintiffs' claim to pierce the corporate veil and impose personal liability on them must fail.

### III. CONCLUSION

Based upon the foregoing, the Court **GRANTS** Defendants Tammy Cisco Walker and Aletha Cisco Shave's Motion for Summary Judgment. (Doc. 190.)

**ORDER ENTERED** at Augusta, Georgia, this 4th day of November, 2014.

_____
HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA